IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ARQUILLA RIDGELL

    v.

MICHAEL J. ASTRUE

:
:
:  Civil Action No. DKC 10-3280
:
:
:

**MEMORANDUM OPINION**

Presently pending and ready for review in this employment discrimination case is a motion to dismiss or for summary judgment filed by Defendant Michael J. Astrue, Commissioner of the Social Security Administration.  (ECF No. 6).  The issues have been briefed, and the court now rules, no hearing deemed necessary.  Local Rule 105.6.  For the following reasons, the motion will be granted in part and denied in part.

**I.   Background**

**A.   Factual Background**

The complaint is very confusing.  This case appears to involve several confrontations between Plaintiff Arquilla Ridgell and her supervisors regarding her employment at the Social Security Administration ("SSA").  Ms. Ridgell is an African-American woman who, since 2001 and until her termination, was employed as a Human Resources Specialist in the Program Development Branch, Division of Training and Human Resources, Office of Disability Adjudication and Review

("DTHR").  (ECF No. 1 ¶ 4; ECF No. 13-1, Ridgell Decl., ¶ 1). Ms. Ridgell's direct supervisor was Christine Moser.  (ECF No. 13-1 ¶ 2).  Ms. Ridgell's second-line supervisor was Kathy Weaver, who reported to Randy Vanderpool, the director of DTHR. (*Id.* ¶ 3).

Ms. Ridgell suffers from anemia and hypertension.  (*Id.* ¶ 57).  Because of her health conditions, Ms. Ridgell requested a quiet workspace at the DTHR.  (ECF No. 6-3, Def.'s Ex. 1A (Merit Systems Protection Board ("MSPB") Hr'g Tr.), at 233-34).  She acknowledges that Mr. Vanderpool made several attempts over time to accommodate her needs by moving her workspace to various locations in the office where the noise was expected to be lower.  (*See id.* at 234-35).  Over the years, Ms. Ridgell made several more requests, including to work from home, but Ms. Moser denied her requests for various reasons, such as for insufficient medical documentation.  (ECF No. 13-1 ¶¶ 14, 17, 48, 59).

## 1. Ms. Ridgell's Complaints to Congress

The following facts regarding Ms. Ridgell's communications with Congress are taken in the light most favorable to Ms. Ridgell.  From 2005 to 2009, Ms. Ridgell sent several complaints in writing, in person, and over the phone to various members of Congress.  (*Id.* ¶ 4).  These communications generally complained of "discrimination, reasonable accommodation, and various other

issues about SSA's mismanagement and abuses." (*Id.*).[1]   In 2008, Eileen McDaniel, the Associate Commissioner, told Ms. Ridgell through Ms. Ridgell's attorney to stop contacting members of Congress.   (*Id.*).   On January 25, 2007, Mr. Vanderpool threatened to "discipline or terminate" Ms. Ridgell if she ever filed any complaints against him.   (*Id.* ¶ 6).   On September 28, 2007, Ms. Moser told Ms. Ridgell that she was aware of the complaints Ms. Ridgell had been making to Congress and that these complaints would be taken into account as part of her performance evaluation.   (*Id.* ¶ 10).   When Ms. Ridgell notified Mr. Vanderpool of Ms. Moser's intervention, Mr. Vanderpool convened a meeting at which he and Ms. Moser told Ms. Ridgell again not to contact Congress or else they would "discipline or terminate" her.   (*Id.* ¶ 11).   On October 30, 2007, Mr. Vanderpool wrote a negative performance evaluation based at least partly on Ms. Ridgell's complaints to Congress.   (*Id.* ¶ 12).   In another meeting that took place the next day, Mr. Vanderpool, Ms. Moser, and Ms. Weaver repeated to Ms. Ridgell their admonition not to contact Congress anymore.   (*Id.* ¶ 13).   Ms. Ridgell contacted Congress at least one more time on May 7, 2008, to complain that Ms. Moser was "harassing and retaliating"

---

[1] For example, at least one of these communications was precipitated by a five-day suspension issued against Ms. Ridgell, which allegedly resulted from discrimination.   (*Id.* ¶¶ 7-8).

against her.  (*Id.* ¶ 25).  Ms. Ridgell also contacted Congress at least once regarding her requests for reasonable accommodation for her disabilities.  (*Id.* ¶ 14).

### 2. The Excel Training Class and Ms. Ridgell's Thirty-Day Suspension

The parties agree that the events surrounding an Excel class that Ms. Ridgell was assigned to teach precipitated her thirty-day suspension.  Their versions of these events, however, differ widely.  Both versions will be recounted here.

### a. Ms. Ridgell's Version

On or about April 9, 2008, Ms. Moser assigned Ms. Ridgell the task of teaching a training course on Microsoft Excel, which was to take place on June 25, 2008.  (*Id.* ¶ 19; ECF No. 6-3, at 211).[2]  Ms. Ridgell asked Ms. Moser for assistance in preparing the class, but Ms. Moser refused to help.  (ECF No. 13-1 ¶ 20). On June 13, 2008, Ms. Moser told Ms. Ridgell that she scheduled a mock training class for Ms. Ridgell to present.  (*Id.* ¶ 22). Ms. Ridgell responded by saying that she was not prepared and that she needed more time.  (ECF No. 6-3, at 216).  At some point, Ms. Ridgell suggested that the class be postponed or

---

[2] The facts in Ms. Ridgell's Declaration differ slightly from her testimony before the MSPB.  At that hearing, Ms. Ridgell testified that Mr. Vanderpool assigned her this task. (ECF No. 6-3, at 211).

cancelled or that a contractor be hired to teach the class. (*Id.* at 218-19).

On June 24, 2008, Ms. Ridgell went to Ms. Moser to discuss the status of the Excel class. (*Id.* at 221). Ms. Moser told Ms. Ridgell that she did not want her to teach the class anymore. (*Id.*). According to Ms. Ridgell, Ms. Moser "informed [Ms. Ridgell] that she was allowing a white person to deliver the training instead of [Ms. Ridgell] because regardless of how educated [Ms. Ridgell] was, she did not want a Nigger delivering any training and that Black people should not teach anything." (ECF No. 13-1 ¶ 38). Either that day or the next, Ms. Ridgell contacted the SSA's Equal Employment Opportunity ("EEO") office to complain about Ms. Moser's comments. (*Id.* ¶ 16; ECF No. 6-3, at 222-23).

Shortly before the Excel class was supposed to take place, Ms. Moser asked Ms. Ridgell to provide her a list of the expected attendees for the course. (ECF No. 6-3, at 224-25).[3] Ms. Ridgell responded that she did not have such a list. (*Id.* at 225). In an effort to comply, Ms. Ridgell gathered the registration forms, which were largely disorganized, and put together a list of attendees for Ms. Moser. (*Id.* at 227).

---

[3] According to the facts proffered by Ms. Ridgell, it is unclear whether this incident took place before or after the June 24th meeting between herself and Ms. Moser.

Kim Smith, a co-worker who did not teach a mock training course, ended up teaching the Excel class on June 25, 2008. (*Id.* at 231-32). Because of these events associated with the Excel class, Ms. Ridgell was suspended from work for thirty days. (ECF No. 13-1 ¶ 19).

### b.   Defendant's Version

In April 2008, Mr. Vanderpool emailed Ms. Moser to suggest that Ms. Ridgell be assigned the task of teaching an Excel class because of her familiarity with the program. (ECF No. 6-3, at 11-12). Ms. Ridgell was excited to teach the training course. (*Id.* at 12). Ms. Moser informed her that she would have to teach a mock training class as well. (*Id.* at 13).

Later, on June 13, 2008, when Ms. Moser reminded Ms. Ridgell of her obligation to teach a mock course, she refused. (*Id.*). Ms. Ridgell also sent an email to Mr. Vanderpool stating that Ms. Moser was "putting additional stipulations on her teaching and putting obstacles in her way." (*Id.* at 14). She proposed either postponing the class or hiring a contractor to teach the class. (*Id.*). Mr. Vanderpool responded via email that it was regular practice at the DTHR to deliver a mock training. (*See id.*). He then convened a meeting with himself, Ms. Ridgell, Ms. Weaver, and Ms. Moser at which he directed Ms. Ridgell to teach the Excel class. (*Id.* at 15). Ms. Ridgell "stormed out of the office, saying that she wasn't going to do

6

it.   She raised her arms and just flailed her arms in the air and stomped out of the office and said she was not going to do it, and so she was going to cancel the class." (*Id.*).   Mr. Vanderpool asked her to return to the meeting and directed her not to cancel the class. (*Id.*).   Ms. Ridgell "just stomped out and left." (*Id.*).   Ms. Ridgell did not teach the mock course. (*Id.* at 19).   Ms. Moser told her that because she did not teach the mock class, she would not be presenting the actual Excel class. (*Id.*).   Ms. Moser asked Ms. Smith and another co-worker, Susan Torres, to teach the class instead. (*Id.*).

On June 20, 2008, Ms. Moser asked Ms. Ridgell to provide a list of the scheduled attendees for the Excel class so that name cards could be prepared ahead of time, but Ms. Ridgell said she did not have a list. (*Id.* at 20).   Ms. Moser directed her to compile a list by the end of the day, which she did. (*Id.*).

On June 24, 2008, Ms. Smith and Ms. Torres delivered a mock training session. (*Id.* at 19-20).

On June 25, 2008, the day of the Excel class, no one showed up to take the course. (*Id.* at 22).   Ms. Moser and Ms. Weaver proceeded to contact the people on the attendee list that Ms. Ridgell had provided. (*Id.*).   They discovered that the putative participants on the list:   (1) did not receive confirmation at all; (2) were told that the class would take place at a later date; or (3) did not exist. (*Id.* at 24).   According to Ms.

Moser, this list was a "bogus list." (*Id.* at 25). When confronted about the list, Ms. Ridgell explained that there must have been a "mix-up." (*Id.* at 26).

As a result of these events, Ms. Moser proposed suspending Ms. Ridgell for thirty days. (*Id.* at 11). For failing to follow supervisory instructions and lack of candor, Mr. Vanderpool approved the suspension. (*Id.* at 136, 143).

### 3. The Individual Development Plan, the Meetings of July 29 and 30, 2009, and Ms. Ridgell's Removal from Federal Service

The parties also agree that events surrounding a class that Ms. Ridgell was assigned to teach regarding an "Individual Development Plan" ("IDP") for the SSA as well as events that took place on July 29 and July 30, 2009, contributed to her termination from service. Their versions of these events again differ, both of which will be recited here.

### a. Ms. Ridgell's Version

On July 1, 2009, Ms. Moser requested that Ms. Ridgell develop an employee information seminar regarding the IDP. (ECF No. 13-1 ¶ 19). Ms. Ridgell, however, was not familiar with the IDP. (*Id.* ¶ 29). Ms. Moser told Ms. Ridgell that she did not need any training regarding the IDP and that no formal training would be provided. (*Id.* ¶ 30). On Ms. Ridgell's request, Ms. Moser put her in touch with other DTHR employees who had experience with the IDP. (*Id.* ¶ 31). After the meeting with

Ms. Moser, Ms. Ridgell commenced putting together a seminar regarding the IDP. (*Id.* ¶ 33).

On July 7, 2009, Ms. Moser held a meeting in which Ms. Ridgell had the opportunity to consult with in-house experts regarding the IDP. (*Id.* ¶ 34). Ms. Ridgell prepared several questions for the attendees. (*Id.*). She was so busy taking notes that she "barely had time to look at anyone." (*Id.*).

About a week later, Ms. Ridgell sought out training on the IDP with the Baltimore office. (*Id.* ¶ 35). The Baltimore office assured her that it would work with her so that she was adequately trained. (*Id.*). Ms. Moser, however, "attempted to discourage [Ms. Ridgell] from obtaining training." (*Id.* ¶ 36).[4]

On or before July 29, 2009, Ms. Ridgell sent to Mr. Vanderpool an email, unrelated to the IDP but relevant to her disabilities, complaining about her co-worker, Vinnie Welch. (*Id.* ¶ 39). Ms. Welch listened to music at work, which, due to Ms. Ridgell's disability, caused Ms. Ridgell to have "difficulty concentrating" and "headaches with resulting nausea." (*Id.*).

---

[4] The rest of Ms. Ridgell's account of the IDP seminar issue is sparse. She notes that after the July 29, 2009, meeting — which will be described next — Ms. Moser came to Ms. Ridgell's desk "flailing a position description in [her] face, stating that [she] was going to teach the IDP seminar training regarding of whether [she] had training or a doctor's appointment, because it was in [her] job description." (*Id.* ¶ 45). She also explains that she could not complete the IDP assignment because she went on disability leave from August through November. (*See id.* ¶ 52).

Mr. Vanderpool refused to intervene and directed Ms. Ridgell instead to contact Ms. Moser and Ms. Welch to resolve the issue. (*Id.* ¶ 40). Ms. Ridgell had already contacted them to no avail, so she contacted Ms. McDaniel's office to deal with the noise situation. (*Id.*). Ms. McDaniel's office then contacted Mr. Vanderpool, who finally resolved the matter by directing Ms. Welch to use headphones when listening to her music. (*Id.*).

On the afternoon of July 29, 2009, Mr. Vanderpool and Ms. Weaver approached Ms. Ridgell. (*Id.* ¶ 41). Mr. Vanderpool expressed that he was angry with Ms. Ridgell for having contacted his supervisor and that she was "creating animosity with [her] disability accommodation request." (*Id.*). After this incident, Ms. Ridgell contacted Ms. McDaniel's office once again to report what she considered to be retaliatory acts by Mr. Vanderpool. (*Id.* ¶ 42). She also requested a reassignment. (*Id.*). At this point, Ms. Moser told Ms. Ridgell to stop contacting Ms. McDaniel's office or else she would be disciplined. (*Id.* ¶ 43). Ms. Moser also told Ms. Ridgell that she would prevent her from ever getting a reassignment. (*Id.*).

The next day, Ms. Ridgell attended a meeting with Mr. Vanderpool, Ms. Moser, and Ms. Weaver. (*Id.* ¶ 46). Mr. Vanderpool "angrily yell[ed]" at her because she had contacted Ms. McDaniel's office the previous day. (*Id.*). Ms. Ridgell again asked if she could be reassigned, and Mr. Vanderpool

responded by telling her to "shut-up" and not to speak. (*Id.*). Ms. Ridgell began to experience symptoms of dizziness and nausea. (*Id.*). After attempting to stand up, she collapsed to the floor. (*Id.*). Mr. Vanderpool called a nurse, and Ms. Ridgell was taken to the hospital. (*Id.*). Ms. Ridgell was diagnosed with having suffered a "hypertensive crisis." (*Id.* ¶ 47).

On October 16, 2009, Ms. Ridgell's supervisors submitted a proposal to remove her from federal employment. (*Id.* ¶¶ 54, 62). On January 6, 2010, the decision to remove became final. (*Id.*).

   **b.  Defendant's Version**

On July 1, 2009, Ms. Moser directed Ms. Ridgell to develop an employee information seminar regarding the IDP. (ECF No. 6-3, at 28-29). Ms. Moser again indicated that she would have to deliver a mock session. (*Id.* at 29). To help Ms. Ridgell prepare for the seminar, Ms. Moser provided her with an informational booklet. (*Id.* at 29-30). Although Ms. Ridgell took the booklet, she initially refused to complete the assignment, indicating that Ms. Moser "couldn't make her do it." (*Id.* at 30). Ms. Ridgell returned to her desk, "tossed the book onto her desk and sat in her chair and put her feet up." (*Id.* at 31-32).

On July 7, 2009, Ms. Moser convened a meeting between Ms. Ridgell and several in-house experts regarding the IDP. (*Id.* at 33). This meeting was an opportunity for Ms. Ridgell to ask questions of the experts. (*Id.* at 33-34). When the experts attempted to provide suggestions for Ms. Ridgell's questions, however, "she rolled her eyes." (*Id.* at 34). She would then "take that same question and rephrase it several different ways." (*Id.*).

Ms. Ridgell continued to protest that she did not have adequate training to deliver an IDP seminar. (*See id.* at 39). At one point, she did attempt to contact the Baltimore office to obtain further training. (*Id.* at 39-40). To assist, Ms. Moser followed-up to confirm that the Baltimore office would indeed conduct a training session regarding the IDP and that Ms. Ridgell could attend. (*See id.* at 40).[5]

On or about July 29, 2009, Ms. Ridgell emailed Ms. Moser stating that "she wasn't a subject matter expert" and that she did not want to take part in the Baltimore training. (*Id.* at 43). In response to this email, Ms. Moser called a meeting between herself, Ms. Ridgell, and Ms. Weaver. (*Id.* at 44). At

---

[5] Ms. Ridgell ultimately did not attend the Baltimore training because of a workplace injury she sustained on August 10, 2009. (*Id.* at 41). She had not registered for the Baltimore training, however. (*Id.* at 41-42). She also "said she would have a doctor's appointment or something," which Ms. Moser interpreted as an excuse not to attend. (*Id.* at 42).

this meeting, Ms. Moser reminded Ms. Ridgell that she was her manager and that she had the authority to assign work to her. (*Id.*).  Ms. Ridgell called Ms. Moser "racist" several times and stated that Ms. Moser was discriminating against her based on her race, her gender, and her disability.  (*Id.* at 44-45).  Ms. Ridgell argued that it was not in her job description to teach. (*Id.*).  During the meeting, Ms. Ridgell "moved forward, lean[ed] up, shook her finger at [Ms. Moser] and called [her] a racist. [S]he did that, probably no more than 20 times, in a 15-minute conversation."  (*Id.* at 45).  She then left Ms. Moser's office, returned to her office, and "put her feet up on her computer table."  (*Id.*).  Ms. Moser brought a copy of Ms. Ridgell's job description to her, which indicated that delivering training was one of her listed responsibilities.  (*Id.* at 46).  At that point, because it was after hours, Ms. Ridgell told Ms. Moser that "she didn't have to listen to [Ms. Moser] anymore."  (*Id.*).

Separately, Ms. Ridgell called Ms. McDaniel's office to complain about the music that Ms. Welch was playing at her desk. (*Id.* at 112).  Ms. Ridgell's tone on the phone was "[v]ery agitated, very demanding, . . . nasty.  Not screaming initially, but very rude."  (*Id.* at 113).  Ms. McDaniel's office proceeded

to contact Mr. Vanderpool about the matter, but Mr. Vanderpool stated that the matter was already resolved. (*Id.*).[6]

The next day, July 30, 2009, Mr. Vanderpool convened a meeting with himself, Ms. Moser, Ms. Weaver, and Ms. Ridgell. (*Id.* at 46). When Ms. Ridgell arrived at the meeting, "she just kind of stomped in. She plopped herself in a chair. She had her fists cl[e]nched. She leaned forward out of her chair toward [Ms. Moser], to the point where [Ms. Moser] had to back up a little bit. She was just very angry looking." (*Id.* at 47). Mr. Vanderpool attempted to explain the purpose of the meeting, but Ms. Ridgell interrupted him: "[S]he started to yell. She called [Mr. Vanderpool, Ms. Weaver, and Ms. Moser] racists. She wouldn't let [Mr. Vanderpool] say anything." (*Id.*). Mr. Vanderpool asked Ms. Ridgell to cooperate. (*Id.* at 48). When she did not, he gave her a direct order to do so. (*Id.*). Ms. Ridgell then suffered a hypertensive episode requiring her to go to the hospital. (*Id.* at 48-49).

Because Ms. Ridgell failed to follow orders regarding the IDP and because of her behavior, she was removed from federal service. (*Id.* at 155-56).

---

[6] Ms. Ridgell continued to call Ms. McDaniel's office "eight or nine times" about a variety of issues. (*Id.* at 115). The intensity of her calls "seemed to escalate." (*Id.* at 116). Although she was reminded to work through the chain of command, Ms. Ridgell stated that she could not work with her managers because they were "racist." (*Id.* at 114, 117).

**B.    Procedural Background**

Like the facts of Ms. Ridgell's case, the specifics of the procedural history of her case are not clear.  Ms. Ridgell filed at least three EEO complaints, and likely more, during her time with DTHR.   First, on September 26, 2008, she filed an EEO complaint alleging that the thirty-day suspension following the Excel class was "discriminatory on the bases of race and disability and taken in retaliation for her prior EEO complaints."  (ECF No. 6-36, Def.'s Ex. 34, at 2).   Second, on July 9, 2009, she filed a complaint alleging discrimination based on disability and race and complaining about the fourteen-day suspension issued against her.  (ECF No. 13-1 ¶ 60).   Third, on November 1, 2009, she filed a complaint alleging discrimination based on disability, race, and sex.  (*Id.* ¶ 61).[7]

With respect to the first EEO complaint, a final agency decision was issued on September 14, 2009, finding no discrimination or retaliation had occurred.  (ECF No. 6-36, at 2).  Ms. Ridgell appealed this EEO decision to the MSPB.  (*See id.*).   Her case was referred to an Administrative Law Judge ("ALJ") for resolution.  (*See generally id.*).   Separately, Ms. Ridgell appealed her termination from service to the MSPB.  (*Id.* at 2).   By order, the ALJ consolidated the two appeals and

---

[7] A final agency decision regarding this November 1, 2009, EEO complaint was issued on June 24, 2010.  (ECF No. 6-37).

conducted a hearing on them in August 2010. (*Id.*). On September 15, 2010, the ALJ issued an initial decision finding that none of Ms. Ridgell's allegations had any merit and affirming the thirty-day suspension and removal. (ECF No. 6-36). The initial decision became final on October 20, 2010. (*See id.* at 22).

On November 19, 2010, Ms. Ridgell filed a complaint in this court. (ECF No. 1). The complaint contains five counts: (1) race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) violation of the Rehabilitation Act; (3) denial of due process under the Fifth Amendment; (4) violation of the First Amendment; and (5) violation of 5 U.S.C. § 2302 of the Civil Service Reform Act ("CSRA"). Defendant filed the pending motion to dismiss or for summary judgment on March 7, 2011. (ECF No. 6). On April 15, 2011, Ms. Ridgell filed an opposition. (ECF No. 13). Defendant replied on April 29, 2011. (ECF No. 14).

## II. Converting a Motion to Dismiss to a Motion for Summary Judgment

Defendant styles its motion as a "motion to dismiss or for summary judgment." (ECF No. 6, at 1). At the outset, Ms. Ridgell argues that despite this caption the court may not treat the motion as one for summary judgment without first providing notice to the parties of its decision to do so. (ECF No. 13, at

36).   Ms. Ridgell's argument is of no avail in light of Fourth Circuit precedent and the Federal Rules of Civil Procedure.

"The district court, while it clearly has an obligation to notify parties regarding any court-instituted changes in the pending proceedings, does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).   In *Laughlin*, the defendant styled its motion as a "Motion to Dismiss, or, in the alternative, Motion for Summary Judgment." *Id.* at 260.   The *Laughlin* court noted that this caption alone provided adequate notice to the plaintiff that the motion might be treated as one for summary judgment. *Id.* Even assuming that the caption did not sufficiently provide notice, the fact that defendant had attached other materials to its motion should have alerted plaintiff to the possibility.   Indeed, the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.   The Federal Rules only state that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."   Fed.R.Civ.P. 12(d).   The *Laughlin* court went on to note that the plaintiff captioned her own opposition motion as a "Memorandum in Opposition to Defendants' Motion to Dismiss, or, in the alternative, for Summary Judgment"

17

and that she attached supporting affidavits. *Id.* at 261. Thus, the court concluded, it was apparent that the plaintiff had actual notice of the possibility that the motion would be disposed of on summary judgment. *Id.*

Here, the scenario is virtually the same as in *Laughlin*. First, Defendant clearly styled its motion in the alternative. Second, Defendant attached several documents to its motion. Third, Ms. Ridgell styled her opposition as "Plaintiff's Response to Defendant's Motion to Dismiss or for Summary Judgment." And fourth, Ms. Ridgell attached a declaration to her motion. Taken together, Defendant gave Ms. Ridgell more than sufficient notice that its motion may be construed as one for summary judgment, and Ms. Ridgell's response clearly indicated that she was on actual notice of the same. There is, therefore, no need for the court to provide formal notice if it intends to treat Defendant's motion as one for summary judgment.[8]

## III. Standard of Review for Summary Judgment

Because both parties rely on matters outside the pleadings, the court will treat the motion as a motion for summary judgment. *See Walker v. True*, 399 F.3d 315, 319 n.2 (4th Cir.

---

[8] Nor has Ms. Ridgell invoked Rule 56(d). That Rule dictates that a non-movant facing a motion for summary judgment to which she is ill-prepared to respond should file an affidavit or declaration explaining what further discovery she requires. *See* Fed.R.Civ.P. 56(d); *Laughlin*, 149 F.3d at 261. Ms. Ridgell has not filed such an affidavit or declaration here.

2005); *Offen v. Brenner*, 553 F.Supp.2d 565, 568 (D.Md. 2008). A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

The party moving for summary judgment has the initial burden to demonstrate that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. In asserting that there is no genuine dispute of fact, a moving party must cite to materials in the record or show that the fact cannot be genuinely disputed. For instance, a moving party may assert that the opposing party cannot produce admissible evidence to support a fact on which that adverse party will have the burden of proof. Thereafter, a party may "object that the material cited [by the other party] cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2). In the face of such an objection, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that

is anticipated." Fed.R.Civ.P. 56(c)(2) advisory committee notes (2010 amendment).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## IV. Analysis

Before considering the merits of Ms. Ridgell's claims, two preliminary matters will be addressed: first, Ms. Ridgell raises issues regarding the admissibility of Defendant's exhibits in support of its motion for summary judgment; and second, Defendant raises an issue regarding Ms. Ridgell's exhaustion of her administrative remedies.

## A. Admissibility of Defendant's Exhibits and Summary Judgment

Ms. Ridgell argues that Defendant is not entitled to summary judgment because "Defendant relies on exhibits that have not been properly placed into evidence before this court." (ECF No. 13, at 21-22). She goes on to dispute generally the authenticity of Defendant's documents, the form of its attached affidavits, and the admissibility of "at least some" of its documents based on hearsay. (*See id.* at 22). Without any evidence, Ms. Ridgell contends, Defendant may not move for summary judgment. (*See* ECF No. 13, at 33-36).

Even if Defendant's exhibits are inadmissible, Ms. Ridgell's conclusion that Defendant is somehow precluded from seeking summary judgment due to its failure to produce any admissible evidence is incorrect. Where the plaintiff has the ultimate burden of proof at trial, a moving defendant is required only to show the absence of a genuine dispute of material fact; it need not affirmatively present evidence to maintain a motion for summary judgment. The commentary to the recent amendments makes clear that the rule of *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in [former] Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."), has not been changed. *See* Fed.R.Civ.P. 56(c)(1)(B) advisory

committee notes (2010 amendment) ("And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

In any event, it appears that at least some of Defendant's exhibits are admissible.  The 2010 amendments to Rule 56 changed the procedure for submitting materials on summary judgment.  The new rule eliminated the "unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D.Mich. Oct. 31, 2011).  The *Foreword Magazine, Inc.* court went on to explain:

> [T]he amended Rule allows a party making or opposing a summary judgment motion to cite to materials in the record including, among other things, "depositions, documents, electronically stored information, affidavits or declarations" and the like. Fed.R.Civ.P. 56(c)(1)(A).  If the opposing party believes that such materials "cannot be presented in a form that would be admissible in evidence," that party must file an objection.  Fed.R.Civ.P. 56(c)(2). Significantly, the objection contemplated by the amended Rule is not that the material "has not" been submitted in admissible form, but that it "cannot" be.  The comments to the 2010 amendments make it clear that the drafters intended to make summary judgment practice conform to procedure at trial. "The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the

> admissible form that is anticipated. There
> is no need to make a separate motion to
> strike." Fed.R.Civ.P. 56 (2010 Advisory
> Committee comments). The revised Rule
> therefore clearly contemplates that the
> proponent of evidence will have the ability
> to address the opponent's objections, and
> the Rule allows the court to give the
> proponent "an opportunity to properly
> support or address the fact," if the court
> finds the objection meritorious.
> Fed.R.Civ.P. 56(e)(1). Thus, the amendment
> replaces a clear, bright-line rule ("all
> documents must be authenticated") with a
> multi-step process by which a proponent may
> submit evidence, subject to objection by the
> opponent and an opportunity for the
> proponent to either authenticate the
> document or propose a method to doing so at
> trial.

*Id.* (footnotes omitted).

To the extent Ms. Ridgell contests the admissibility of Defendant's exhibits based on authenticity grounds, she does not actually argue that Defendant cannot produce admissible versions of the same for trial. Her objection, then, may not be proper under Rule 56. *See id.* ("Significantly, the objection contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be."). Even if Ms. Ridgell's objection were proper, Defendant explains that it could certify any unauthenticated records to

cure this current defect in their admissibility.  (*See* ECF No. 14, at 3 n.4).[9]

To the extent Ms. Ridgell contests the admissibility of the exhibits based on hearsay grounds, however, her objection is more vexing.  She did not specify which documents or portions of documents contain inadmissible hearsay.  Ms. Ridgell's vague hearsay objection is therefore not well-taken.  *See Maltas v. Maltas*, 197 F.Supp.2d 409, 427 (D.Md. 2002) ("It is not the responsibility of the court to sift through the documents to determine exactly what should be excluded, if anything."), *rev'd on other grounds*, 65 F.App'x 917 (4th Cir. 2003).  At the same time, Defendant did not even attempt to address this concern.[10] In light of the revised Rule 56 and its accompanying comments, which explicitly place the burden on the proponent of evidence

---

[9] Why Defendant did not simply take this action in response to Ms. Ridgell's objection is unclear.

[10] Similarly, Defendant fails to respond to Ms. Ridgell's evidentiary objection to the affidavit exhibits.  As to these exhibits, however, Ms. Ridgell's objection is clearer.  Per Rule 56(c)(4), affidavits "must be made on personal knowledge," among other requirements.  Here, the affidavit exhibits attached to Defendant's motion do not conform to this requirement.  Instead, the affiants attested to their statements "to the best of [their] knowledge and belief."  (*E.g.*, ECF No. 6-6, Def.'s Ex. 4 (Moser Aff.)).  This type of affirmation is insufficient under the Federal Rules for an affidavit to support a motion for summary judgment.  *See Barnett v. Perry*, No. CCB-11-CV-00122, 2011 WL 5825987, at *7 (D.Md. Nov. 16, 2011).  Accordingly, the affidavit exhibits will not be considered at this time.

to establish admissibility when contested, it is unclear that either party has fully discharged its evidentiary obligations.

In an abundance of caution, the court will assume — without deciding — that Ms. Ridgell properly objects to the admissibility of all of Defendant's summary judgment motion exhibits based on hearsay and that Defendant has not adequately explained how to fix this issue for any exhibit. Despite this objection, Ms. Ridgell cites to several of the exhibits in support of her own arguments. (*See* ECF No. 13, at 23 n.3, 25, 26, 30 (citing ECF Nos. 6-3, 6-36)). Where Ms. Ridgell relies on Defendant's exhibits, namely the transcript of the MSPB hearing (ECF No. 6-3) and the opinion of the ALJ (ECF No. 6-36), she has likely waived her hearsay objection to those particular exhibits. *Cf. Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998) (holding that the defendant waived its hearsay objection to evidence proffered by the plaintiff in opposition to a motion for summary judgment where the defendant submitted the same evidence in support of its own prior motions). Thus, Defendant has advanced some admissible evidence in support of its position, and at least this evidence may be relied upon as appropriate in resolving this motion.

###### B. Failure to Exhaust Claims Stemming from the November 1, 2009, EEO Complaint

Defendant argues that Ms. Ridgell's claims arising out of her November 1, 2009, EEO complaint are untimely.  (ECF No. 6-1, at 25-27).  Ms. Ridgell contends that this timeliness argument is in the nature of an affirmative defense, which means that the burden is on Defendant to establish it.  (ECF No. 13, at 32-33).  According to her, Defendant has not met its burden.  (*Id.*).  Defendant avers in reply that in the employment discrimination context, the burden of establishing timeliness of the filing of the complaint when contested by the defendant actually falls on the plaintiff, which Ms. Ridgell has failed to do.  (ECF No. 14, at 2).

Both parties ignore the more fundamental question of what exactly are Ms. Ridgell's claims that are based on the November 1, 2009, EEO complaint.  Neither party specifies how the allegations in that EEO complaint constitute viable Title VII or Rehabilitation Act claims, nor can the court untangle Ms. Ridgell's intentions here.  It is unclear what claims would actually be foreclosed or permitted were the court to accept or reject Defendant's argument.  Lacking adequate guidance from the parties, resolution of this issue on summary judgment is not appropriate.  For now, therefore, Defendant's motion on this ground will be denied.

### C.   Count One:  Title VII

In the first count of the complaint, Ms. Ridgell asserts that Defendant discriminated against her on the basis of race and sex in contravention of Title VII.  Title VII bars federal government employers from engaging in "any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16.[11]  The primary challenge here is in deciphering the basis of Ms. Ridgell's specific claims under Title VII.  Although Ms. Ridgell advances a litany of allegations that occurred over a five-year period, she fails to identify any *theory* of how those alleged facts make out claims under Title VII.

A plaintiff may establish claims for intentional discrimination on the basis of race or sex using two methods.  First, the plaintiff may demonstrate "through direct or circumstantial evidence" that her race or sex "motivated the employer's adverse employment decision."  *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004).  Alternatively, a plaintiff may "proceed under a 'pretext' framework, under which the employee, after establishing a prima

---

[11] "Notwithstanding the differences in wording, sections 2000e-2 [which address private sector claims] and 2000e-16 generally have been treated as comparable, with the standards governing private-sector claims applied to claims under section 2000e-16."  *Bhella v. England*, 91 F.App'x 835, 844 (4th Cir. 2004).

facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id.* at 285. "Regardless of the route a plaintiff follows in proving a Title VII action, the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal citations and footnotes omitted). An adverse employment action is one that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Id.* (internal quotations omitted).

Here, Defendant construes the complaint as describing three relevant adverse employment actions:  (1) the thirty-day suspension related to the Excel training course; (2) a fourteen-day suspension;[12] and (3) the removal from federal service. (*See, e.g.*, ECF No. 6-1, at 28).  Ms. Ridgell has not quarreled with Defendant's interpretation of her claims.  In fact, in her opposition, Ms. Ridgell does not address Defendant's argument with respect to the fourteen-day suspension.  (*See, e.g.*, ECF No. 13, at 24).  Accordingly, only the thirty-day suspension and

---

[12] In the complaint, Ms. Ridgell makes a passing allusion to a fourteen-day suspension that she was subjected to sometime before July 9, 2009.  (ECF No. 1 ¶ 66).  She provides no other context for this suspension.  Defendant explains that this fourteen-day suspension refers to a disciplinary action levied against Ms. Ridgell in March 2009 for a misuse of transit funds. (ECF No. 6-1, at 7-9).  Ms. Ridgell does not dispute this description of the suspension.

the termination from service will be analyzed as the bases for potentially viable Title VII claims.

### 1.    The Thirty-Day Suspension

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotations omitted). If believed, direct evidence "would prove the existence of a fact . . . without any inference or presumptions." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (internal quotations omitted), *rev'd on other grounds*, 517 U.S. 308 (1996). To defeat a motion for summary judgment, the evidence must show that the employer announced, admitted, or "otherwise unmistakably indicated" that an impermissible consideration was a determining factor, or that discrimination can properly be assumed from the circumstances. *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982). Here, Ms. Ridgell presents direct evidence that Defendant discriminated against her based on race.

In her declaration, Ms. Ridgell proffers evidence that Ms. Moser called her a "Nigger" and specifically referenced her race as a reason for not allowing her to proceed with the teaching of the Excel training class. (*See* ECF No. 13-1 ¶ 38). Defendant disputes that this statement or anything like it was ever said,

though it admits that Ms. Ridgell's failure to follow through with the Excel class was one of the reasons that she was suspended for thirty days. (*See* ECF No. 6-3, at 136).[13] Although "stray or isolated statements" may not qualify as direct evidence in employment discrimination actions, derogatory remarks demonstrating "some nexus . . . between the alleged discriminatory statements and *any* of the employment decisions made by the [employer]" will suffice. *See O'Connor*, 56 F.3d at 549. Here, viewing the evidence in the light most favorable to Ms. Ridgell, she has advanced direct evidence that her race impermissibly bore on Defendant's decision to suspend her for thirty days.

Additionally, to satisfy the nexus requirement in a direct evidence case, the person making the statement must hold the status of "decisionmaker" within the defendant employer's organization. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring in the judgment) ("[S]tatements by non-decisionmakers, or statements by

---

[13] Although Defendant adamantly asserts that Ms. Moser never made the derogatory comment and assails Ms. Ridgell's proffer of this statement as uncorroborated, Ms. Ridgell has nonetheless satisfied her burden of production as to this material fact via her sworn declaration. On summary judgment, the court must view the evidence in the light most favorable to Ms. Ridgell, as credibility determinations are inappropriate at this time. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644 (4th Cir. 2002).

decisionmakers unrelated to the decisional process itself, [do not] suffice to satisfy the plaintiff's burden."), *superseded by statute on other grounds by* 42 U.S.C. § 2000e, *et seq.; Hill*, 354 F.3d at 286–87.  In *Hill*, the Fourth Circuit evaluated which agents of an employer could constitute a "decisionmaker," reasoning that the term encompasses both agents of the defendant with formal decisionmaking authority as well as those agents who possess "principal responsibility" for the employment decision. *See* 354 F.3d at 289, 297 (noting that direct supervisors may qualify as decisionmakers under this analysis).  In this case, it is undisputed that Ms. Moser was one of Ms. Ridgell's supervisors and that her recommendation for suspension at least partially formed the basis for Mr. Vanderpool's ultimate decision to suspend.  Thus, the nexus requirement for Ms. Ridgell's direct evidence claim is firmly established. Accordingly, Defendant's motion must be denied on this basis.

### 2.  The Removal from Service

Ms. Ridgell contends that Ms. Moser's derogatory comment carries forward as direct evidence that her termination was impermissibly affected as well.  (*See* ECF No. 13, at 23 ("[Plaintiff] has provided direct evidence of racial animus on the part of her first-line supervisor, which Plaintiff contends has infected all of the adverse decisions against her as asserted in her Complaint.")).  Although it is somewhat

31

troubling that the proposal to terminate Ms. Ridgell's federal service came more than sixteen months after the derogatory statement allegedly was made, it cannot be concluded at this stage as a matter of law that racial bigotry did not play a role in Ms. Ridgell's removal.   Mr. Vanderpool testified at the MSPB hearing that one of the factors that led to Ms. Ridgell's ultimate termination was that she had been suspended previously for the events surrounding the Excel class.   (*See* ECF No. 6-3, at 168).   As discussed earlier, Ms. Ridgell has presented evidence that this thirty-day suspension was racially motivated. Especially when coupled with evidence that Ms. Moser was, again, the one who proposed removing Ms. Ridgell from service (*id.* at 27), there is a genuine dispute of material fact whether discrimination played a role in Ms. Ridgell's removal, which defeats summary judgment.   Indeed, as the Fourth Circuit recently reminded courts faced with questions of discrimination:

> Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of "the ultimate question of discrimination *vel non*." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983). As the Supreme Court has explained, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (4th Cir. 2010).

### 3.   Sex Discrimination

Defendant moved for summary judgment on Ms. Ridgell's Title VII claims in terms of both race and sex discrimination.   Ms. Ridgell, however, failed to bring forward any evidence in support of her gender-based theory.   As the party opposing the motion, Ms. Ridgell was obliged to "set forth specific facts showing that there is a genuine issue for trial," *Bouchat*, 346 F.3d at 522, but she has not.   In consequence, any Count One claims based on a theory of sex discrimination may not proceed.

### D.   Counts Two, Three, and Four:   Rehabilitation Act, First Amendment, and Fifth Amendment

Ms. Ridgell's second, third, and fourth causes of action are for violations of the Rehabilitation Act, her Fifth Amendment due process rights, and her First Amendment rights, respectively.

If a party moves for summary judgment concerning claims for which the non-moving party bears the ultimate burden of proof and the non-moving party fails to address specifically the movant's arguments regarding those claims, then the court may consider those claims abandoned and grant summary judgment. *See Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777

(D.Md. 2010); *Mentch v. E. Sav. Bank, FSB*, 949 F.Supp. 1236, 1246-47 (D.Md. 1997).

Here, Ms. Ridgell presented five causes of action in her complaint against the Agency. (ECF No. 1). Defendant moved for summary judgment as to all five causes of action on various bases. (ECF No. 6). In response to Defendant's motion, Ms. Ridgell specifically addressed Defendant's arguments concerning only two of the five counts — the Title VII claim and the CSRA claim. (ECF No. 13). Accordingly, Ms. Ridgell's claims for violations of the Rehabilitation Act, the First Amendment, and the Fifth Amendment will be deemed abandoned, and summary judgment will be granted in Defendant's favor as to these claims.

### E.   Count Five:  CSRA

In the final count of the complaint, Ms. Ridgell contends that Defendant violated the "Merit System Principles" as provided for in 5 U.S.C. § 2302.[14]  Defendant argues that Ms. Ridgell has failed to exhaust her administrative remedies, but Ms. Ridgell disagrees. Both parties point to the opinion of the ALJ below (ECF No. 6-36) as indicative of their respective

---

[14] The "Merit System Principles" are actually enumerated in 5 U.S.C. § 2301. Section 2302 does, however, include a provision prohibiting violation of § 2301. 5 U.S.C. § 2302(b)(12). This provision is included in Count Five.

positions regarding whether Ms. Ridgell exhausted her administrative remedies.[15] Defendant avers that nowhere in the opinion does the ALJ explicitly mention § 2302. (*See* ECF No. 14, at 9). Ms. Ridgell counters that the opinion substantively reflects consideration of § 2302. (*See* ECF No. 13, at 29-32).

Section 2302 of Title 5 of the United States Code is part of the CSRA, Pub.L.No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.), which "comprehensively overhauled the civil service system," creating a "framework for evaluating adverse personnel actions against [federal employees]," *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (quoting *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773-74 (1985)). "It prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Id.* (quoting *United States v. Fausto*, 484 U.S. 439, 443 (1988)).

Where, as here, a plaintiff alleges claims of discrimination stemming from an action — such as a thirty-day suspension or a removal from service — that are directly

---

[15] Defendant also points to Ms. Ridgell's MSPB appeals forms, on which she failed to check off the box indicating that she was bringing affirmative defenses pursuant to § 2302. Because the admissibility of those exhibits is not firmly established, the court declines to consider them here.

appealable to the MSPB[16] pursuant to the CSRA, the case is called either a "mixed-case complaint" or a "mixed-case appeal," depending on where the plaintiff initially files the administrative complaint. *See* 29 C.F.R. § 1614.302. A "mixed-case complaint" is filed with the EEO Commission, while a "mixed-case appeal" is filed with the MSPB. *Id.*[17] Where a mixed case is presented, "[a]n aggrieved person may initially file a mixed case complaint with an agency . . . or an appeal on the same matter with the MSPB pursuant to 5 C.F.R. § 1201.15, but not both." *See id.* § 1614.302(b). "Either agency is authorized, and required, to address both the discrimination issues and the civil service issues that arise in a mixed case." *McAdams v. Reno*, 64 F.3d 1137, 1141 (8th Cir. 1995); *accord Briggs v. Dalton*, 984 F.Supp. 353, 355 (D.Md. 1997). "Whichever is filed first is then considered the employee's election, and once chosen, the employee must exhaust [her] remedies in that forum." *Devaughn v. U.S. Postal Serv.*, 293 F.App'x 276, 280 (5th

---

[16] The MSPB is "an independent, quasi-judicial federal administrative agency established to review civil service decisions." *McAdams v. Reno*, 64 F.3d 1137, 1141 (8th Cir. 1995).

[17] Here, Ms. Ridgell's case appears to be a hybrid of the two types of mixed cases. Ms. Ridgell filed a mixed-case *complaint* to address her thirty-day suspension. (*See* ECF No. 6-36, at 2). She filed a mixed-case *appeal* to address her removal from federal service. (*See id.*). Once the matters were before the ALJ, they were consolidated for discovery and resolution. (*See id.*).

Cir. 2008); *see also Bonds v. Leavitt*, 629 F.3d 369, 379 (4th Cir. 2011) (applying Title VII's exhaustion of administrative remedies requirement to the CSRA in a mixed case).

There is sufficient evidence in the form of the ALJ's opinion to avert summary judgment on this count. The question is whether the facts considered by the ALJ could constitute the basis on which Ms. Ridgell's CSRA claims are maintained. *See Bonds*, 629 F.3d at 379 ("[C]ourts possess jurisdiction over only those claims 'like or related to allegations contained in the charge and growing out of such allegations.'" (quoting *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992))). Violations of the CSRA may include personnel actions that discriminate on the basis of race, sex, or disability, or that are generally unfair. *See* 5 U.S.C. § 2302(b)(1)(A),(D); *see also id.* § 2302(b)(12). They may also include retaliatory actions. *See id.* § 2302(b)(8),(9).

Here, in the "Background" section of the ALJ's opinion, the ALJ wrote: "[Ms. Ridgell] denied all specifications of all charges and alleged that she had been subjected to discrimination on the bases of disability, race and sex and retaliation for filing EEO complaints and writing to Congress." (ECF No. 6-36, at 2). Later in the opinion, the ALJ addressed certain affirmative defenses that Ms. Ridgell raised, which included allegations of discrimination and retaliation. (*See*

37

ECF No. 6-36, at 15-20).    In short, the ALJ likely considered factual allegations that could give rise to claims pursuant to § 2302.   It cannot be held as a matter of law that Ms. Ridgell has failed to exhaust her administrative remedies.    Defendant's motion will be accordingly denied without prejudice to renewal.[18]

## V.   Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant will be granted in part and denied in part. A separate order will follow.

                                    /s/
                        DEBORAH K. CHASANOW
                        United States District Judge

---

[18] Defendant argues in the alternative that the MSPB's decision below regarding Ms. Ridgell's § 2302 claims should be affirmed, but that argument is raised for the first time in Defendant's reply brief.   (ECF No. 14, at 10).    Especially because it appears that the complete administrative record is not before the court, consideration of this argument will be declined at this time.   *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").