IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ARQUILLA RIDGELL                    :

                                   :

     v.                            :   Civil Action No. DKC 10-3280

                                   :

CAROLYN W. COLVIN                   :

                                   :

**MEMORANDUM OPINION**

Presently pending and ready for review in this federal employment discrimination case is the renewed motion for summary judgment filed by Defendant Carolyn W. Colvin in her official capacity as Acting Commissioner of the Social Security Administration ("the Agency"). (ECF No. 33).[1] The issues have been briefed, and the court now rules, no hearing deemed necessary. Local Rule 105.6. Because disputed issues of material fact remain as to Plaintiff Arquilla Ridgell's claims of race-based discrimination, the motion will be granted in part and denied in part.

## I.   Background

### A.   Factual Background

The following facts are either undisputed or construed in the light most favorable to Ms. Ridgell, the non-moving party.

---

[1] Pursuant to Fed.R.Civ.P. 25(d), Carolyn W. Colvin, the current Acting Commissioner of Social Security, has been substituted for former Commissioner Michael J. Astrue.

Ms. Ridgell is an African-American woman who suffers from anemia and hypertension.  She worked for the Agency from 2001 until her termination in 2010.  In 2005, Ms. Ridgell was transferred to the Agency's Office of Disability Adjudication and Review, Division of Training and Human Resources ("DTHR"), where she became a Human Resources Specialist.  (ECF No. 33-2, Ridgell Depo. at 42).  At some point after this reassignment, Christine Moser became Ms. Ridgell's direct supervisor.  (*Id.* at 44).  At all relevant times, Ms. Ridgell's second-line supervisor was Kathy Weaver, who reported to Randy Vanderpool, the director of DTHR.  (*Id.* at 58).  This action arises from two disputes between Ms. Ridgell and her supervisors, one of which led to a suspension and one of which led to her removal from service.

### 1.   The Thirty-Day Suspension

On or about April 9, 2008, Mr. Vanderpool e-mailed Ms. Ridgell and Ms. Moser stating that, "given [Ms. Ridgell's] expertise with Excel, I would like her to assume program responsibilities for delivering Excel training . . . . Please meet, discuss, and come up with a plan that will allow us to deliver a classroom program within the month." (MSPB 335-36).[2] Ms. Moser followed up with Ms. Ridgell that same day about

---

[2] Citations to "MSPB" refer to the administrative record, which the Agency filed under seal on August 21, 2012.

scheduling a meeting for later that week, to which Ms. Ridgell replied "Sounds good." (MSPB 335).

Ms. Ridgell avers that she repeatedly asked Ms. Moser for assistance in preparing the class, but Ms. Moser refused to help. (ECF No. 13-1, Ridgell Decl. ¶ 20). Ms. Ridgell had difficulty developing the training manual and preparing for the class because the existing materials were outdated and because she was unable to access the current version of the Excel software. (*See generally* MSPB 1488-93). On May 16, 2008, Ms. Ridgell sent a draft announcement for an Excel 1 training class to her supervisors. (MSPB 332). In response, Ms. Moser stated "This looks good!" and inquired about possible dates for the class. (*Id.*). Ms. Ridgell indicated that the room for the training class had been reserved for June 25, 2008. (*Id.*).

Several weeks later, on June 13, 2008, Ms. Moser told Ms. Ridgell that she had scheduled a mock Excel training class for Ms. Ridgell to present. (ECF No. 13-1, Ridgell Decl. ¶ 22). Ms. Ridgell emailed Mr. Vanderpool stating that "I want to teach the Excel class as you requested but [Ms. Moser] is putting obstacles in my way by adding stipulations to my teaching." (MSPB 330). Ms. Ridgell also asked Mr. Vanderpool if he would prefer to hire a contractor to teach the Excel class. (*Id.*). In response, Mr. Vanderpool explained that "[d]elivering mock sessions is a process we've used in this division successfully

for many years." (MSPB 329). Mr. Vanderpool also reiterated that Ms. Ridgell had been asked to present a mock class "as an assignment of work." (*Id.*). Ms. Ridgell replied that "I did not previously agree to deliver a mock training and I will not be delivering any 'mock' training sessions. I am requesting for funds to hire a contractor." (*Id.*).

Later on June 13, Mr. Vanderpool convened a meeting with himself, Ms. Ridgell, Ms. Weaver, and Ms. Moser. According to each of the three supervisors, Mr. Vanderpool directed Ms. Ridgell to conduct a mock training session, but Ms. Ridgell refused to do so and pledged to cancel or reschedule the class. (MSPB 1290-91, 1365-66, 1415-16). The three supervisors also testified that Mr. Vanderpool specifically directed Ms. Ridgell not to cancel or reschedule the June 25 class. (MSPB 1291, 1367, 1418). Ms. Ridgell acknowledges that a meeting took place on June 13, but recalls only that it was "very confusing" and that she left "without a clear understanding of what was transpiring." (ECF No. 33-2, Ridgell Depo. at 79).

Shortly after the meeting, Ms. Ridgell sent another email to Ms. Moser stating that "I am not prepared to give a 'mock training'" and suggesting that the Excel class be postponed or rescheduled. (MSPB 326). Ms. Moser responded as follows:

> Arquilla, per our conversation with Randy, postponing is not an option. Please be prepared to deliver a 30-45 minute 'mock'

4

> presentation next Wednesday [June 18] or
> Thursday [June 19] to several members of the
> [] team.

(*Id.*).  Ms. Ridgell, in turn, replied:

> Chris, per our conversation earlier, I will
> not be prepared and will not be able to
> deliver a "mock" session.  I am still trying
> to prepare for delivery of the real class.
> I still need to finish the training manual.
> I also may not be here on Wednesday or
> Thursday due to medical appointments.  If my
> delivering the June 25 Excel training is now
> based on delivering a 'mock' [session] then
> the classes will be postponed.

(*Id.*).  Ms. Ridgell denies that this statement contravened Mr.
Vanderpool's instructions.  (ECF No. 33-2, Ridgell Depo. at 86).

On June 19, Ms. Moser assigned two other employees to teach
the June 25 Excel class.  (MSPB 1295).  On or about June 20, Ms.
Moser asked Ms. Ridgell to provide her a list of the expected
attendees for the class.  (ECF No. 33-2, Ridgell Depo. at 87).
Ms. Ridgell responded that she did not have such a list.  (*Id.*
at 88).  At Ms. Moser's direction, Ms. Ridgell nonetheless
prepared a list of 24 individuals she "thought" had registered
for the June 25 class.  (*Id.* at 88-89).

The facts surrounding a purported meeting between Ms. Moser
and Ms. Ridgell on June 24, 2008, remain in dispute.  Ms.
Ridgell maintains that she went to Ms. Moser's office to discuss
the status of the class, and Ms. Moser told Ms. Ridgell that she
did not want her to teach the class anymore.  (ECF No. 33-2,

Ridgell Depo. at 92, 94).   According to Ms. Ridgell, Ms. Moser said that "she would not have given [Ms. Ridgell] the assignment if it had been left up to her" and then "called [Ms. Ridgell] a nigger and said that niggers shouldn't teach anything." (*Id.* at 92, 94-95).   No one else was present during this exchange. (*Id.* at 94).   For her part, Ms. Moser does not specifically recall a meeting on June 24 but adamantly denies that she ever called Ms. Ridgell the "N word" or any other racial names.   (MSPB 1356-58).[3]

Either later that day or the following day, Ms. Ridgell contacted the Agency's Equal Employment Opportunity ("EEO") office about Ms. Moser's comments. (ECF No. 33-2, Ridgell Depo. at 95-96; *see also* ECF No. 38-3, at 4).   On June 25, Ms. Ridgell sent an email to the Office of Personnel Management stating:

> On June 24, the day before I was to deliver the training, my supervisor informed me that she was allowing a White person to deliver the training instead of me because regardless of how educated I was, she did not want a 'Nigger delivering any training' and that 'Black people should not teach anything', and she wanted my uneducated White co-workers to be instructors.

(ECF No. 38-4, at 1).   Ms. Ridgell is unsure whether she ever told Mr. Vanderpool about Ms. Moser's disparaging remarks. (ECF No. 33-2, Ridgell Depo. at 96).

---

[3] Ms. Moser does admit that she called Ms. Ridgell a "spoiled brat" at some point in 2007, but contends that the statement was "in jest." (MSPB 1358-59).

On June 24, 2008, the replacement instructors delivered a mock Excel training session. (MSPB 1296). On June 25, 2008, the day of the Excel class, no one showed up to take the course. (MSPB 24, 1298, 1414-15). Ms. Moser and Ms. Weaver contacted the people on the attendee list provided by Ms. Ridgell. (MSPB 1298, 1368-80, 1418). They discovered that the putative participants on the list (1) had not received confirmation at all; (2) were told that the class would take place at a later date; or (3) did not exist. (*Id.*).

When her supervisors confronted her, Ms. Ridgell explained that she had never been asked to keep a list of attendees and had to compile one from her color-coded registration system. (ECF No. 33-2, Ridgell Depo. at 90). Ms. Ridgell admits that her list was not accurate, but maintains that it was an "honest mistake." (*Id.* at 90-91).

Based on these events, Ms. Moser proposed suspending Ms. Ridgell for thirty days for failing to follow supervisory instructions and lack of candor. (MSPB 23-30). Ms. Ridgell, through counsel, filed a response to the proposal, asserting that she had been "set up for failure" in receiving the training assignments; that she had been subjected to discrimination because "no Caucasian employee had been required to deliver 'mock training sessions'"; and that she had been subjected to retaliation for her whistleblower activities. (MSPB 282-84).

7

After considering Ms. Ridgell's response, Mr. Vanderpool imposed the proposed thirty-day suspension, effective August 6, 2008. (MSPB 277-280).  Mr. Vanderpool stated that "I entirely agree with Ms. Moser's proposal" and that "I do not agree that you were treated unfairly, discriminated against or were the victim of retaliation." (*Id.* at 277).  In addition to the misconduct alleged by Ms. Moser, Mr. Vanderpool added that Ms. Ridgell had violated his direct orders to deliver the mock training session and not to cancel the June 25 class. (*Id.* at 278).

### 2.   Removal from Federal Service

On July 1, 2009, Ms. Moser requested that Ms. Ridgell develop an employee information seminar regarding the IDP. (ECF No. 33-2, Ridgell Depo. at 105; MSPB 1304).  On July 7, 2009, Ms. Moser held a meeting for Ms. Ridgell to ask questions of employees who had experience regarding the IDP. (ECF No. 33-2, Ridgell Depo. at 108).  Although Ms. Moser contends that Ms. Ridgell was rude and disrespectful during this meeting (MSPB 1310), Ms. Ridgell maintains that she took the meeting very seriously (ECF No. 13-1, Ridgell Decl. ¶ 35; MSPB 1521-24).

A week later, Ms. Ridgell sought out training on the IDP from the Baltimore office. (ECF No. 13-1, Ridgell Decl. ¶ 35). Ms. Moser discouraged Ms. Ridgell from doing so and told her "there was no reason for her to go to Baltimore because we had expertise in-house." (MSPB 1313-14).  Ms. Moser concedes,

however, that she never gave Ms. Ridgell a specific order not to contact the Baltimore office. (*Id.*).

The parties agree that Ms. Ridgell had a number of interactions with her supervisors on July 29, 2009, but dispute the timing and details of these interactions. On the morning of July 29, Ms. Ridgell sent an email to Mr. Vanderpool complaining of nausea and dizziness as a result of a co-worker's music. (ECF No. 33-2, Ridgell Depo. at 113). Mr. Vanderpool advised Ms. Ridgell to speak with Ms. Moser or directly with the co-worker to resolve this issue. (*Id.* at 114).[4] Because she "felt the [noise] issue wasn't being addressed," Ms. Ridgell contacted the office of Eileen McDaniel, Mr. Vanderpool's supervisor. (*Id.*). Ms. McDaniel's executive assistant represents that Ms. Ridgell called at least sixteen times that day; was "agitated," "very demanding," "nasty," and "very rude"; and "demanded" reassignment. (MSPB 1388-89). Ms. Ridgell does not recall how many times she called Ms. McDaniel's office, but denies that she was rude. (ECF No. 33-2, Ridgell Depo, at 116-17).

During the afternoon of July 29, Ms. Ridgell met with Ms. Moser and Ms. Weaver to discuss her calls to Ms. McDaniel's

---

[4] Mr. Vanderpool avers that he also spoke in person with Ms. Ridgell about what he had done to address her concerns. (MSPB 1425-26). Ms. Ridgell denies that such a conversation took place. (ECF No. 33-2, Ridgell Depo. at 115).

office, her requests for reassignment, and a "train-the-trainer" program in connection with the IDP assignment. Ms. Moser recalls Ms. Ridgell as being combative and threatening during this meeting; repeatedly accusing her of being a racist; and indicating that she would probably have a doctor's appointment "or something" when the training session was scheduled. (MSPB 1317-20). Ms. Weaver largely corroborates Ms. Moser's version of events, including that Ms. Ridgell called Ms. Moser a racist fifteen or twenty times during the meeting. (MSPB 1372). Ms. Ridgell denies that she acted unprofessionally and avers that it was Ms. Moser who became angry. (ECF No. 13-1, Ridgell Decl. ¶ 45). Ms. Ridgell also denies saying that she would be unavailable for the "train the trainer" session. (*Id.*).

The next day, July 30, Ms. Ridgell attended a meeting with Mr. Vanderpool, Ms. Moser, and Ms. Weaver. (ECF No. 33-2, Ridgell Depo, at 119-20). The parties dispute what transpired at this meeting. According to Ms. Ridgell, Mr. Vanderpool yelled at Ms. Ridgell for contacting Ms. McDaniel's office. (*Id.*). The other attendees, however, aver that Ms. Ridgell raised her voice to drown out Mr. Vanderpool each time he attempted to speak and repeatedly accused the supervisors of being racists, even after Mr. Vanderpool specifically ordered Ms. Ridgell to allow him to speak. (MSPB 1324, 1439-41). At some point after Ms. Ridgell began complaining of dizziness, Mr.

Vanderpool called an ambulance, which transported Ms. Ridgell to the hospital.  (ECF No. 33-2, Ridgell Depo. at 121-22).

On August 4, 2009, Ms. Moser met with Ms. Ridgell about her performance review.   Ms. Ridgell maintains that Ms. Moser "became angry" during this meeting when Ms. Ridgell requested that she consider the outstanding performance appraisal she had received in a prior position.  (ECF No. 13-1, Ridgell Decl. ¶¶ 51-52).   Ms. Moser recalls that Ms. Ridgell remained adamant that she did not have to deliver any training programs and that she was entitled to reassignment.  (MSPB 1327-28).

On August 10, 2009, Ms. Ridgell fell in the restroom and took worker's compensation leave.  (MSPB 1317).   On October 16, 2009 – while Ms. Ridgell was still on leave – Ms. Moser proposed to remove Ms. Ridgell from federal service based on two charges: failure to follow instructions (supported by four specifications) and conduct unbecoming a federal employee (supported by eleven specifications).   (MSPB 697-707).   Ms. Ridgell, through counsel, responded to the proposed removal on November 10, 2009, by denying the alleged misconduct and asserting generalized claims of reprisal, harassment, and discrimination based on disability.  (MSP 616-27).

On January 6, 2010, Mr. Vanderpool issued the decision to remove Ms. Ridgell from federal service, sustaining each of the charges and specifications proposed by Ms. Moser.   (MSPB 607-

14).   Mr.   Vanderpool   explained   that   he   had   considered   Ms.
Ridgell's   response   but   found   that   her   denials   of   the   alleged
misconduct   lacked   credibility   because   "I   personally   have
observed   you   engaging   in   such   conduct   on   numerous   occasions,
including   several   of   the   instances   described   above"   and   "there
is   no   doubt   that   you   failed   to   follow   both   Ms.   Moser's   and   my
instructions."   (*Id.* at 609).

### 3.   Complaints to Congress & EEO Activity

From   2005   to   2009,   Ms.   Ridgell   sent   numerous   complaints   to
various   members   of   Congress   asserting   that   the   Agency   had
committed   discrimination,   refused   to   make   reasonable
accommodations   for   her   disabilities,   and   engaged   in   unspecified
"mismanagement   and   abuses."   (ECF   No.   13-1,   Ridgell   Decl.   ¶   4).
Separately,   Ms.   Ridgell   filed   at   least   three   complaints   with   the
Agency's   EEO   office   and   also   served   as   a   witness   in   an   EEO
proceeding   involving   a   co-worker.   (*Id.* ¶¶   12,   18,   54,   60,   61).

According   to   Ms.   Ridgell,   at   various   points   during   2007   and
2008,   both   Mr.   Vanderpool   and   Ms.   Moser   discouraged   her   from
communicating   with   Congress   and   participating   in   EEO
proceedings.   (*See id.* ¶¶   6,   10-13).   Mr.   Vanderpool   and   Ms.
Moser   purportedly   threatened   to   discipline   Ms.   Ridgell   or
terminate   her   employment   if   she   continued   her   complaints,   and
also   issued   her   at   least   one   negative   performance   review.
(*Id.*).   Mr.   Vanderpool   acknowledges   his   awareness   of   Ms.

Ridgell's various communications with Congress and her EEO complaints at the time he approved both the thirty-day suspension and the removal from federal service. (MSPB 1410, 1460-61). Mr. Vanderpool denies, however, that any retaliatory animus motivated these decisions. (MSPB 1410).

   **B.   Procedural Background**

   On September 26, 2008, Ms. Ridgell filed an EEO complaint alleging that the thirty-day suspension was "discriminatory on the bases of race and disability and taken in retaliation for her prior EEO complaints." (MSPB 1129). On September 14, 2009, the Agency issued a final decision finding that no discrimination or retaliation had occurred. In October 2009, Ms. Ridgell appealed the Agency's decision to the Merit Systems Protection Board ("MSPB").

   Separately, in February 2010, Ms. Ridgell filed an appeal of her termination directly with the MSPB. In August 2010, the MSPB ordered the two proceedings to be consolidated. Administrative Law Judge Sarah P. Clement conducted a two-day hearing on both matters. On September 15, 2010, Judge Clement issued an initial decision affirming both the thirty-day suspension and the removal. (MSPB 1116-42). As to the suspension, Judge Clement concluded that the Agency proved the charges of failure to follow instructions and lack of candor by showing that Ms. Ridgell refused to teach the mock training

session; that she cancelled or rescheduled the Excel training class despite Mr. Vanderpool's express order not to do so; and that she deliberately provided a bogus list of attendees to cover up her cancellation of the class. (MSPB 1121).

Judge Clement also upheld Ms. Ridgell's removal from service even though the Agency did not prove each of the specifications it alleged. (MSPB 1128-30). With respect to the charge of failing to follow instructions, Judge Clement found that the Agency did not prove either that Ms. Ridgell had violated any order not to contact the Baltimore field office, or that Ms. Ridgell failed to complete the IDP assignment. Judge Clement nonetheless sustained the charge based on evidence that Ms. Ridgell did not conduct herself appropriately during the July 30 meeting, despite Mr. Vanderpool's order. Likewise, Judge Clement found that the Agency proved some (but not all) of the specifications in support of the charge of conduct unbecoming a federal employee, based on Ms. Ridgell's rude and hostile conduct; calling her supervisors racists; questioning her supervisors' authority; and making harassing phone calls.

Judge Clement also rejected each of Plaintiff's affirmative defenses (*i.e.*, her claims of race, gender, and disability discrimination, as well as her claims of retaliation based on prior EEO activity and her communications with Congress). (MSPB 1130-34). Finally, Judge Clement found that

14

the Agency's selected penalties were "well within the bounds of reasonableness."   (MSPB 1137).   The initial decision became final on October 20, 2010.

On November 19, 2010, Ms. Ridgell filed a five-count complaint in this court.  (ECF No. 1).  On March 2, 2012, the court issued a memorandum opinion and order granting in part and denying in part the Agency's pre-discovery motion to dismiss or for summary judgment.  (ECF Nos. 15 & 16).  Two counts now remain:  (1) Plaintiff's claim that the Agency violated 5 U.S.C. § 2302 of the Civil Service Reform Act of 1978 ("CSRA") and (2) Plaintiff's claims that the Agency intentionally discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") by issuing the suspension and removing her from federal service.

After the parties engaged in discovery, the Agency renewed its motion for summary judgment as to Ms. Ridgell's remaining claims on August 24, 2012.  (ECF No. 33).  Ms. Ridgell filed an opposition (ECF No. 38), and the Agency replied (ECF No. 39).

## II.  **Standard of Review**

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).   Summary judgment is

15

inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted). At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Analysis

### A.  Ms. Ridgell's Failure to Respond to the Agency's Requests For Admissions

Before reaching the issues that have been briefed by both parties, it is necessary to address the Agency's argument – raised for the first time in its reply – that summary judgment

is warranted based on Ms. Ridgell's failure to respond to its post-discovery requests for admissions.  (ECF No. 39, at 6-9). The Agency served its requests for admissions on Ms. Ridgell's counsel on August 6, 2012 *via* express mail.  (ECF No. 39-1).  As of November 28, 2012 (the date when the Agency filed its reply), Ms. Ridgell had not provided any response to these requests. (ECF No. 39, at 9).  The Agency argues that, by operation of Fed.R.Civ.P. 36(a)(3), Ms. Ridgell has admitted to the matters embodied within its requests – including (1) that "Christine Moser never called [her] a 'nigger' in [her] presence at any time"; (2) that "Intentional racial discrimination was not the reason [she was] suspended for 30 days in 2008"; and (3) "Racial discrimination played no part in the [Agency's] determination to remove [her] from [her] position."  (ECF No. 39-1).

As the Agency observes, Rule 36(a)(3) provides that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  It is well-established that "'unanswered requests for admissions may properly serve as a basis for summary judgment.'"  *Vales v. Preciado*, 809 F.Supp.2d 422, 426-27 (D.Md. 2011) (quoting *Donovan v. Porter*, 584 F.Supp. 202, 207-08 (D.Md. 1984)).

What the Agency ignores, however, is "[t]he ordinary rule in federal courts" that "an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F.Supp.2d 731, 734 (D.Md. 2006). The Agency made no mention of this possible ground for relief in its opening brief, precluding Ms. Ridgell from addressing the issue in her opposition. This omission cannot be overlooked simply because Ms. Ridgell's responses were not due until after the deadline for pretrial dispositive motions. The Agency could have served its requests at an earlier date, but instead chose to wait until the last possible day permitted by the scheduling order.

It is somewhat troubling that Ms. Ridgell has not moved to withdraw her default admissions pursuant to Rule 36(b) despite the passage of more than five months and in the face of both a courtesy reminder letter from the Agency (ECF No. 39-3) and the Agency's reply brief (ECF No. 39). Nonetheless, given the abundance of sworn testimony from Ms. Ridgell in the record that supports her version of events – including as to the critical alleged racial slur by Ms. Moser – summary judgment will not be granted based on the default admissions.

B.    **Violations of the CSRA**

The Agency contends that it is entitled to summary judgment on Ms. Ridgell's CSRA claims in light of the deferential standard of review that applies to Judge Clement's decision.

The CSRA provides a "framework for evaluating adverse personnel actions against [federal employees]" and "prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Hall v. Clinton*, 235 F.3d 202, 204 (4th Cir. 2000) (internal quotation marks omitted).  For certain types of adverse actions (including the suspension and termination at issue here), an employee has a right to appeal the decision to the MSPB.   5 U.S.C. § 7513(d).   Where the employee seeks to bring a "mixed case" by alleging that the agency's action violated relevant anti-discrimination laws (including, for example, Title VII), several avenues of administrative review are available.   First, the employee may file a "mixed case complaint" with her agency's EEO office.   29 C.F.R. § 1614.302(b)(1).  Upon issuance of a final agency decision, the employee can appeal that decision to the MSPB.   *Id.* Alternatively, the employee may file a "mixed case appeal" directly with the MSBP.  29 C.F.R. § 1614.302(b)(2).

Ms. Ridgell pursued both of these options:  she filed a mixed case complaint with the Agency's EEO office as to her

thirty-day suspension and a mixed case appeal with the MSPB as to her termination. As noted, the MSPB consolidated the two matters and issued a single final decision. Ordinarily, appeals from MSPB decisions are heard in the United States Court of Appeals for the Federal Circuit. *See* 5 U.S.C. § 7703(b)(1). United States district courts have jurisdiction to entertain appeals of MSPB final decisions in mixed cases. *See* 5 U.S.C. § 7703(b)(2); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265-66 (4th Cir. 2001). In such appeals, discrimination claims are reviewed *de novo*, while nondiscrimination claims must be reviewed pursuant to the "arbitrary and capricious" standard set forth in 5 U.S.C. § 7703(c). In other words, the court must determine – based on the administrative record – whether the MSPB's actions, findings, or conclusions are: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Id.* The appellant bears the burden of proving arbitrariness or capriciousness, procedural impropriety, or lack of substantial evidence. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir. 1998).

Here, the basis of Ms. Ridgell's CSRA claim remains unclear. In Count V of her complaint, Ms. Ridgell alleges that the Agency violated the following subsections of the CSRA:

§ 2302(b)(1);   § 2302(b)(2);   § 2302(b)(8);   § 2302(b)(9);   and § 2302(b)(12).   (ECF No. 1 ¶¶ 81-84).   Yet in her opposition, the only argument that Ms. Ridgell advances in support of her assertion that "Merit System Principles Have Been Violated" is that Judge Clement erred by rejecting Plaintiff's affirmative defense of retaliation.   (ECF No. 38, at 31-33).   Because she does not reference § 2302(b)(2), § 2302(b)(8), or § 2302(b)(12) in her opposition, Ms. Ridgell has abandoned her CSRA claim to the extent it relies on these provisions.   *See, e.g.*, *Jonson v. United States*, 861 F.Supp.2d 629, 634 (D.Md. 2012) ("Failure to raise issues in opposition to summary judgment functions as a waiver.").[5]

Ms. Ridgell's allegation that the Agency violated the anti-retaliation provision of the CSRA, § 2302(b)(9), constitutes a non-discrimination claim that is subject to review under the arbitrary and capricious standard.   *See, e.g.*, *Webster v. Dep't of the Army*, 911 F.2d 679, 688-90 (Fed.Cir. 1990) (reviewing MSPB's decision on the petitioner's affirmative defense of

---

[5] Ms. Ridgell also does not specifically contest Judge Clement's conclusions sustaining the Agency's charges of failure to follow instructions, lack of candor, and conduct unbecoming a federal employee.   Nor does she question Judge Clement's conclusion that the penalties imposed were reasonable under *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 301 (1981). Accordingly, these portions of Judge Clement's decision will not addressed.

reprisal for procedural impropriety, substantial evidence, and arbitrariness or capriciousness).[6]    Subsection 2302(b)(9)(A) states, in relevant part, that employees with supervisory authority may not:

> (9) take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of—
>
> > (A) the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation[.]

In her decision, Judge Clement correctly summarized Ms. Ridgell's burden of proof as to her affirmative defense of retaliation: "[Ms. Ridgell] must show that she engaged in protected activity; [that] the agency official responsible for the disputed action knew of such activity; [that] the disputed action under review could, under the circumstances, have been retaliation; and [that] there was a genuine nexus between the alleged retaliation and the disputed action." (MSPB 1135 (citing *Trammel v. Dep't of Veterans Affairs*, 60 M.S.P.R. 79, 88-89 (1993); *Warren v. Dep't of the* Army, 804 F.2d 654, 656-68

---

[6]   By contrast, Ms. Ridgell's claims of race-based discrimination in violation of § 2302(b)(1)(A) – which incorporates the anti-discrimination provisions of Title VII – will be subject to *de novo* review as below.  Ms. Ridgell's claims of discrimination based on her disability in violation of § 2302(b)(1)(D) – which incorporates the anti-discrimination provisions of the Rehabilitation Act of 1973 – were previously dismissed.  (*See* ECF No. 15).

(Fed.Cir. 1986)).   Although  Judge  Clement  observed  that  Mr.
Vanderpool  had  testified  that  "he  was  aware  that  [Ms.  Ridgell]
had  filed  numerous  EEO  complaints  and  written  numerous  letters
to  Congress,"  she  nonetheless  concluded  that  Ms.  Ridgell  failed
to  "show  that  her  protected  activity  was  the  reason  for  her
suspension  and  removal,  rather  than  the  stated  reasons  for  each
action."   (MSPB  1135).    Thus,  Judge  Clement  held  that  "the
record  is  clear  that  [Ms.  Ridgell]  was  suspended  and  then
removed  because  of  her  repeated  and  intolerable  misconduct,  not
her  protected  activity."  (*Id.*).

In  her  opposition,  Ms.  Ridgell  appears  to  contend  that
Judge  Clement  erred  in  holding  that  there  was  no  nexus  between
her  protected  activity  and  the  Agency's  personnel  actions,
pointing  to  Mr.  Vanderpool's  knowledge  of  her  complaints  as  well
as  the  close  temporal  proximity  between  her  June  19,  2008  EEO
complaint  and  the  July  2,  2008  proposal  of  the  suspension.   (ECF
No.  38,  at  31-32).   The  Federal  Circuit  has  observed  that  an
employee's  burden  of  establishing  a  causal  connection  is  not
"too  onerous"  and  does  not  require  "direct  evidence  of  the
deciding  official's  intent,  but  only  evidence  from  which  the  AJ
can  properly  infer  that  the  retaliatory  motive  caused  the
adverse  action."  *Webster*,  911  F.2d  at  689.   Indeed,  "in  almost
all  situations  [the  causal  connection]  must  be  inferred  from

23

circumstantial evidence." *Id.* (quoting *McClellan v. U.S. Postal Serv.*, 19 M.S.P.R. 237, 239 (1984)).[7]

The type of temporal proximity cited by Ms. Ridgell may, in some cases, constitute circumstantial evidence that gives rise to the inference of an actual causal connection. It cannot be said, however, that "this record, as a matter of law, *requires* such an inference of nexus." *Id.* at 690 (emphasis added). After considering all of the evidence, conducting a two-day hearing, and weighing the credibility of the witnesses, Judge Clement provided a well-reasoned and thorough opinion concluding that Ms. Ridgell had not satisfied her burden of showing that there was any nexus between her protected activity and the personnel actions at issue. Ms. Ridgell has not provided any basis to question Judge Clement's assessment of the witnesses' credibility. *See, e.g.*, *Bieber v. Dep't of Army*, 287 F.3d 1358, 1364 (Fed.Cir. 2002) (MSPB credibility determinations are "virtually unreviewable on appeal"). Although she contends that disputed issues of material fact exist regarding Mr. Vanderpool's purported retaliatory animus, it is "not our function" as a reviewing court to "re-weigh conflicting

_____

[7] In support of her argument, Ms. Ridgell cites to cases involving retaliation claims under Title VII. (ECF No. 38, at 31-32). As the Agency notes in its reply, Ms. Ridgell's citations are inapposite because her complaint seeks relief for retaliation under the CSRA rather than Title VII.

evidence" relating to non-discrimination claims. *Rupert v. Geren*, 605 F.Supp.2d 705, 717 (D.Md. 2009) (internal quotation marks and citations omitted). In sum, Ms. Ridgell has not met her burden of showing that Judge Clement's decision as to Ms. Ridgell's retaliation defense is arbitrary and capricious, unsupported by substantial evidence, or contrary to law, and the Agency is entitled to judgment on Ms. Ridgell's CSRA claim.

### C.   Discrimination Based on Race

The Agency also contends that the evidence adduced during discovery establishes that it is entitled to summary judgment on Ms. Ridgell's Title VII claims. As explained above, although the MSPB rejected Ms. Ridgell's claims of discrimination, such claims are subject to *de novo* review. *See* 5 U.S.C. § 7703(c).

Title VII bars federal government employers from engaging in "any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16.[8] A plaintiff may establish claims for intentional discrimination on the basis of race using two methods. First, the plaintiff may demonstrate "through direct or circumstantial evidence" that her race "motivated the employer's adverse employment decision." *Hill v.*

---

[8] "Notwithstanding the differences in wording, sections 2000e-2 [which address private sector claims] and 2000e-16 generally have been treated as comparable, with the standards governing private-sector claims applied to claims under section 2000e-16." *Bhella v. England*, 91 F.App'x 835, 844 (4th Cir. 2004).

*Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004). Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted). In order for discriminatory remarks about race to constitute direct evidence, "there must be some nexus . . . between the alleged discriminatory statements and *any* of the employment decisions." *O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 549 (4th Cir. 1995) (internal quotation marks omitted), *rev'd on other grounds*, 517 U.S. 308 (1996). Alternatively, a plaintiff may "proceed under a 'pretext' framework, under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285.

In its previous memorandum opinion, the court denied Defendant's motion for summary judgment as to Ms. Ridgell's race-based discrimination claims based on her presentation of direct evidence. (ECF No. 15, at 29-33). This evidence consisted of Ms. Ridgell's declaration averring that Ms. Moser called her a "Nigger" and referenced her race as a reason for not allowing her to teach the Excel training class. Based on

the undisputed evidence showing "that Ms. Moser was one of Ms. Ridgell's supervisors and that her recommendation for suspension at least partially formed the basis for Mr. Vanderpool's ultimate decision to suspend[,]" the court concluded that the required nexus between the suspension and Ms. Moser's purported statements was "firmly established." (*Id.* at 31).   Although the court observed that the sixteen-month gap between Ms. Moser's alleged derogatory statement and Ms. Ridgell's removal "is somewhat troubling," it nonetheless concluded that genuine issues of material fact existed as to whether discrimination played a role in the termination, given that Ms. Moser also proposed the removal. (*Id.* at 31-32).

In its renewed motion, the Agency asserts that Ms. Ridgell can no longer rely on Ms. Moser's comments to serve as direct evidence of discrimination because (1) Ms. Ridgell's deposition testimony disproves any nexus between the purported slur and the misconduct that precipitated Ms. Ridgell's suspension and termination; and (2) the purported slur does not reflect any discriminatory animus by Mr. Vanderpool, who served as the ultimate decisionmaker for both adverse actions and did not blindly "rubber-stamp" Ms. Moser's recommendation. (ECF No. 33-

1, at 36-41).[9]   In her opposition, Ms. Ridgell contends that her deposition testimony reaffirms that genuine issues of material fact remain as to whether the Agency engaged in race-based discrimination and that the Supreme Court's decision in *Staub v. Proctor Hospital*, --- U.S. ----, 131 S.Ct. 1186 (2011), forecloses Defendant's ultimate decisionmaker theory.   (ECF No. 38, at 23-30).   Ms. Ridgell's arguments are well-taken.

First, Ms. Ridgell's deposition testimony is consistent with both her testimony before the MSPB and the declaration she submitted in opposition to the Agency's first motion for summary judgment.   At her deposition, Ms. Ridgell recalled her June 24, 2008 meeting with Ms. Moser as follows:

> What I remember was [Ms. Moser] stating that she did not give me the assignment, [Mr. Vanderpool] did, she did not want me to teach the course or the class.   She then called me a nigger and said that niggers shouldn't teach anything.

(ECF No. 33-2, Ridgell Depo. at 94-95).[10]   The Agency makes much of Ms. Ridgell's concession that the purported racial slur

---

[9]   The Agency also asserts that Ms. Ridgell's express acknowledgement in her deposition that she lacks any evidence of similarly situated comparators precludes her from relying on the *McDonnell Douglas* burden-shifting framework to defeat summary judgment.   (ECF No. 33-1, at 41 (citing Ridgell Depo. at 100-01, 131)).   Ms. Ridgell does not dispute this admission in her opposition, nor does she attempt to invoke *McDonnell Douglas*.

[10]   The Agency continues to deny that Ms. Moser ever made the purported derogatory slur.   Nonetheless, the evidence must be

occurred *after* she engaged in the misconduct that precipitated her suspension (*e.g.*, refusing to teach the mock class; cancelling the June 25 class; and providing a bogus attendee list).    The Agency's reasoning appears to be as follows: because Ms. Ridgell violated her supervisors' orders before Ms. Moser made the racial slur, that slur cannot be causally connected to the suspension, which was based primarily on Ms. Ridgell's failure to follow her supervisors' instructions.   This logic not supported by any citation to case law and is utterly unpersuasive because the standard in the Fourth Circuit is that a derogatory remark can serve as direct evidence if it shares "some nexus" with an employment decision.   *O'Connor*, 56 F.3d at 549.   As observed in the court's prior memorandum opinion, the nexus between Ms. Moser's statement and the thirty-day suspension is "firmly established" when the evidence is viewed in the light most favorable to Ms. Ridgell.[11]   Although the nexus between Ms. Moser's comments and the removal is more attenuated,

---

viewed in the light most favorable to Ms. Ridgell as credibility determinations are inappropriate at the summary judgment stage. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644 (4th Cir. 2002).

[11]   Contrary to the Agency's argument, Ms. Ridgell's acknowledgement that the person who previously taught the Excel course was an African-American female (ECF No. 33-2, Ridgell Depo. at 59-60) does not eliminate the nexus because there is nothing in the record indicating that Ms. Moser supervised that individual or gave her the assignment to teach the Excel class.

nothing in Ms. Ridgell's deposition testimony changes the court's prior conclusion that a genuine dispute of material fact exists as to whether discrimination played a role in Ms. Ridgell's removal.

Second, the Agency's "ultimate decisionmaker" argument also is unavailing.  The Agency contends that, under *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 290 (4th Cir. 2004), Ms. Moser's comments cannot serve as direct evidence of discrimination because "there is no dispute that she was Mr. Vanderpool's subordinate, that Mr. Vanderpool was the ultimate decision-maker for both the suspension and the removal actions, and that . . . there is absolutely no evidence that Mr. Vanderpool merely rubber-stamped the proposed discipline." (ECF No. 33-1, at 40).  In *Hill*, the Fourth Circuit held that, although "the person allegedly acting pursuant to a discriminatory animus need not be the formal decision-maker to impose liability upon an employer for an adverse employment action," the plaintiff must present "sufficient evidence to establish that the subordinate was the one principally responsible for, or the actual decisionmaker behind, the action."  *Hill*, 354 F.3d at 288-89 (internal quotation marks omitted).

If *Hill* provided the final word on an employer's liability for the discriminatory animus of subordinates, the Agency's

argument might be persuasive.   Recently, however, the Fourth
Circuit recognized that a plaintiff can also establish
discrimination through direct evidence by showing that "non-
decisionmaker colleagues" possessed "pervasive animus for the
plaintiff" that "influenced the ultimate decisionmaker." *Young
v. United Parcel Serv., Inc.*, --- F.3d ----, 2013 WL 93132, at
*9 (4th Cir. Jan. 9, 2013) (citing *Meritt v. Old Dominion Freight
Line, Inc.*, 601 F.3d 289, 297 (4th Cir. 2010); *Staub*, 131 S.Ct.
at 1186)).   In *Young*, the Fourth Circuit held that the plaintiff
had not established discrimination through direct evidence where
she failed to show *either* that the individual who made
discriminatory comments "possessed the authority to make
determinations about [the plaintiff's] employment," as required
under *Hill*, or that he had "sought to influence" the supervisor
who did have such authority, as required under *Staub*.

In *Staub*, the Supreme Court examined allegations of
employment discrimination in the context of the Uniformed
Services Employment and Reemployment Rights Act of 1994, 38
U.S.C. § 4301 *et seq*. ("USERRA").   In the decision below, the
Seventh Circuit construed the plaintiff as asserting a "cat's
paw" theory of discrimination; in other words, the plaintiff
"sought to hold his employer liable for the animus of a
supervisor who was not charged with making the ultimate
employment decision."   131 S.Ct. at 1190.   The Supreme Court

rejected the Seventh Circuit's holding that a cat's paw theory could not succeed "unless the nondecisionmaker exercised such singular influence over the decisionmaker that the decision to terminate was the product of blind reliance." *Id.* (internal quotation marks omitted). Instead, relying on principles of tort and agency law, the Supreme Court pronounced the appropriate test as follows: "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194.

Here, genuine issues of material fact exist as to the animus, intent, and proximate causation elements of the *Staub* test, which both parties agree applies to Ms. Ridgell's Title VII claims.[12] First, as discussed, when Ms. Ridgell's version of events is credited, there is sufficient evidence from which a reasonable jury could conclude that Ms. Moser was motivated by

_____

[12] Although *Staub* involved USERRA, the Court observed that the language of USERRA "is very similar to Title VII." *Staub*, 131 S.Ct. at 1191. As noted, the Fourth Circuit has endorsed *Staub*'s reasoning in the context of a Title VII claim. *See Young*, --- F.3d ----, 2013 WL 93132, at *9. This is consistent with the many decisions applying *Staub* to Title VII claims. *See, e.g.*, *McKenna v. City of Philadelphia*, 649 F.3d 171, 177 n. 5 (3$^d$ Cir. 2011); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194-95 (10th Cir. 2011); *Davis v. Omni-Care, Inc.*, 482 F.App'x 102, 2012 WL 1959367, at *7 n. 8 (6th Cir. June 1, 2012). Thus, as the parties do in their briefs, it will be assumed that *Staub*'s reasoning applies here.

racial animus when she proposed Ms. Ridgell's suspension and removal from service. Second, a reasonable jury also could conclude that Ms. Moser intended for her recommendations to cause Ms. Ridgell's suspension and termination. Third, as to causation, there is also evidence supporting that Ms. Moser's recommendations proximately caused Ms. Ridgell's suspension and termination. Mr. Vanderpool testified before the MSPB that he considered Ms. Moser's proposals and her descriptions of Ms. Ridgell's behavior in making his decisions. (MSPB 1407, 1431). A reasonable jury could conclude that this consideration establishes proximate causation, which requires only "some direct relation between the injury asserted and the injurious conduct alleged." *Staub*, 131 S.Ct. at 1192.

In its reply, the Agency contends that *Staub* is inapplicable because "the record is replete with evidence that Mr. Vanderpool had first-hand knowledge of, and personal involvement in, all of the challenged actions in this case." (ECF No. 39, at 25). In other words, the Agency asserts that, because Mr. Vanderpool reached his decisions independently, Ms. Moser's actions cannot be the proximate cause of the personnel decisions. The *Staub* Court, however, declined to adopt a "hard-and-fast rule" that a decisionmaker's independent investigation into, and rejection of, an employee's allegations of discrimination negates the effect of an earlier discriminatory

act.    Rather,  in  light  of  the  principle  that  an  employment
decision  may  have  multiple  proximate  causes,  the  Court  observed
that  "the  supervisor's  biased  report  may  remain  a  causal  factor
if  the  independent  investigation  takes  it  into  account  without
determining  that  the  adverse  action  was,  apart  from  the
supervisor's  recommendation,  entirely  justified."  *Id.* at 1193.

Numerous  courts  have  applied  this  portion  of  *Staub*  to  hold
that  it  is  for  a  jury  to  decide  whether  the  ultimate
decisionmaker  reached  his  decision  independently  of  the
subordinate  supervisor's  discriminatory  act.    *See, e.g.*, *Clayton
v. John H. Stone Oil Distributor, LLC*, No. 2:11-cv-2276, 2012 WL
4359293, at *8 (E.D.La. Sept. 21, 2012) ("The degree to which
[the  employer's]  decision  to  discharge  [the  plaintiff]  as  a
result  of  its  own  completely  independent  investigation  into  the
events  [in  question]  is  a  question  of  fact  which  is  to  be
resolved  by  a  jury."); *Lowe v. Medco Health Solutions of
Willingboro, LLC*, No. 10-4823, 2012 WL 2344844, at *6 (D.N.J.
June 19, 2012) (denying summary judgment because "even if it was
a  more  senior  member  of  [the  employer]  that  ultimately
authorized  Plaintiff's  termination,  this  does  not  negate  [the
subordinate  supervisor's]  potentially  discriminatory  animus  as
another  proximate  cause  of  Plaintiff's  termination"); *accord
Kurth v. City of Inkster*, No. 10-11973, 2011 WL 6371085, at *5
(E.D.Mich. Dec. 20, 2011) (denying judgment as a matter of law

because a reasonable jury could conclude that a nondecisionmaker's biased report was a proximate cause of the plaintiff's termination despite trial testimony that the decisionmaker conducted an independent investigation).

As in those cases, it cannot be said as a matter of law that Ms. Moser's proposals did not remain a causal factor in Mr. Vanderpool's decision to suspend and terminate Ms. Ridgell. As the Agency explains in detail in its reply (*see* ECF No. 39), there is evidence indicating that Mr. Vanderpool determined that the suspension and removal were "entirely justified" even absent Ms. Moser's recommendations. For example, he testified that Ms. Moser's descriptions of events were corroborated by Ms. Weaver and were "in line with what I had witnessed myself." (MSPB 1431). He also testified that he gave many of the orders that Ms. Ridgell allegedly disobeyed. (*See, e.g.*, MSPB 1418, 1462-63). Yet, when the evidence is construed in the light most favorable to Ms. Ridgell, a reasonable jury could also conclude that Mr. Vanderpool's investigation and decision did not sever the causal connection between Ms. Moser's proposals and the adverse employment actions. Accordingly, the Agency's motion for summary judgment as to Ms. Ridgell's race-based discrimination claims must be denied.

**IV.   Conclusion**

For the foregoing reasons, the motion for summary judgment filed by the Agency will be granted in part and denied in part. A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
